## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Hollis J. Larson,

               Plaintiff,

v.

State of Minnesota Department of Humans
Services et al.,

               Defendants.

Case No. 23-cv-1823 (JRT/DJF)

**REPORT AND RECOMMENDATION**

Plaintiff Hollis J. Larson, a civil detainee of the Minnesota Sex Offender Program ("MSOP"), brings a ten-count complaint against the MSOP, the Minnesota Department of Human Services ("DHS"), and various officials from those agencies in their individual and official capacities. (Amended Complaint, ECF No. 30 ¶ 22.) The crux of his complaint is that Defendants improperly failed to diagnose him with post-traumatic stress disorder ("PTSD") and to provide him with adequate mental health care to treat it. Mr. Larson further complains that Defendants have discriminated against him by subjecting him to solitary isolation and other discipline in response to behaviors resulting from his PTSD, and that they retaliated against him for filing grievances. This matter is before the Court on Defendant Michael Woods' Motion to Dismiss ("Woods Motion to Dismiss") (ECF No. 58) and Defendants Minnesota Department of Human Services ("DHS"), Minnesota Sex Offender Program ("MSOP"), Jodi Harpstead, Nancy Johnston, Terrance Kneisel, John Barry, Elizabeth Peterson, Gary Ankarlo, Blake Carey, David Miles, Katie MacDowell, David Lindlbauer, Kayla Taylor, Nicole Boder, Krista Gilpin, and Andrew Christensen's (together, "DHS Defendants") Motion to Dismiss ("DHS Motion to Dismiss") (ECF

No. 68). For the reasons given below, the Court recommends granting the Woods Motion to Dismiss and granting in part denying in part the DHS Motion to Dismiss.

## I.    Background

### A.    *Karsjen* Litigation

This is not Mr. Larson's first lawsuit against the MSOP alleging improper conditions of confinement. In *Karsjens v. Minnesota Department of Human Services*, No. 11-cv-3659 (DWF/TNL) (D. Minn.) ("*Karsjens*"), a class of plaintiffs consisting of all detainees who were then committed at the MSOP, including Mr. Larson, pursued numerous claims regarding the lawfulness of conditions at the MSOP. *See Karsjens* (ECF Nos. 203, 635). The *Karsjens* litigation continued for more than a decade, involved multiple appeals, and finally concluded on February 21, 2024 with the denial of the plaintiffs' petition for a writ of certiorari in the United States Supreme Court. *See Karsjens v. Piper*, 845 F.3d 394, 409 (8th Cir. 2017) ("*Karsjens I*"); *Karsjens v. Lourey*, 988 F.3d 1047, 1051 (8th Cir. 2021) ("*Karsjens II*"); *Karsjens v. Harpstead*, 74 F.4th 561 (8th Cir. 2023) ("*Karsjens III*"), *cert. denied*, 144 S. Ct. 814 (2024); *see also Karsjens* (ECF Nos. 1, 1005, 1036, 1118, 1200, 1216).

The operative complaint in *Karsjens*, filed October 14, 2014, asserted the following thirteen claims: (I) Minnesota Statute § 253D (the "MCTA") (which provides for the civil commitment and treatment of sex offenders) is facially unconstitutional; (II) the MCTA is unconstitutional as applied; (III) the defendants failed to provide adequate treatment to MSOP detainees in violation of the United States and Minnesota Constitutions; (IV) the defendants failed to provide treatment in violation of the MCTA; (V) the defendants denied detainees the right to be free from punishment in violation of the United States and Minnesota Constitutions; (VI) the defendants denied detainees the right to less restrictive alternative confinement in violation of the

United States and Minnesota Constitutions; (VII) the defendants denied detainees the right to be free from inhumane treatment in violation of the United States and Minnesota Constitutions; (VIII) the defendants denied detainees the right to religion and religious freedom in violation of the United States Constitution; (IX) the defendants unreasonably restricted free speech and free association in violation of the United States and Minnesota Constitutions; (X) the defendants conducted unreasonable searches and seizures in violation of the United States and Minnesota Constitutions; (XI) the defendants violated court ordered treatment requirements; (XII) certain individual defendants breached the detainees' contractual rights; and (XIII) certain individual defendants tortiously interfered with the detainees' contractual rights and intentionally violated Minn. Stat. § 253B.03, subd. 7 (establishing the right to treatment plans). *Karsjens*, Third. Am. Compl. (ECF No. 635) ("*Karsjens* TAC") ¶¶ 226–352.

Central to the class claims in *Karsjens* were the plaintiffs' allegations that the defendants in that matter—consisting of the Commissioner of DHS and various MSOP employees (in their official capacities), including several of the named Defendants in this action—imposed policies and procedures that resulted in unconstitutional and illegal conditions of confinement. *See Karsjens*, TAC ¶ 1. Following years of litigation and appeals, all these claims ultimately were dismissed. Among other things, the court held that the conditions of confinement and the challenged MSOP policies and procedures were not unconstitutional or otherwise illegal. *See Karsjens* (ECF No. 1005); *Karsjen I*, 845 F.3d at 407–411; *Karsjens II*, 988 F.3d at 1051–1054; *Karsjens III*, 74 F.4th at 572.[1]

---

[1] In addition to *Karsjens*, Mr. Larson has brought lawsuits against the MSOP or its officials for a variety of alleged unconstitutional conduct in: *Larson v. Jesson, et al.*, 11-cv-2247 (PAM/LIB) (D. Minn.); *Larson v. MSOP, et al.*, 13-cv-1074 (JRT/DJF) (D. Minn.); *Larson v. Bogenholm*, 18-cv-2554 (WMW/DTS) (D. Minn.); and *Larson v. Minnesota Dept. of Human Svcs.*, 19-cv-2811 (WMW/DTS) (D. Minn.).

### B. Mr. Larson's Amended Complaint

Many of Mr. Larson's allegations are generalized and pled collectively against all Defendants. For example, Mr. Larson alleges:

> DHS', MSOP's, Jodi Harpstead's, Nancy Johnston's, Terrance Kneisel's, John Barry's, Elizabeth Peterson's, Gary Ankarlo's, Blake Carey's, David Miles', Katie MacDowell's, David Lindlbauer's, Kayla Taylor's, Michael Woods', Nicole Boder's, Krista Gilpin's and Andrew Christensen's actions are part of deliberate institutional customs, policies, and practices, relating to denial of adequate medical treatment, arbitrary cruelty and denial of basic needs, prevention of plaintiff from progressing in treatment to a point of having any chance of release and retaliation for any complaints or grievances for violations of his rights. It is further these defendants' institutional policy to employ therapists who lack licenses or other necessary qualifications.

(ECF No. 30 ¶ 115; *see also id.* ¶¶ 103–117, raising similarly generalized allegations against all Defendants.) But Mr. Larson does raise specific allegations focusing on three issues: (1) improper diagnostic care; (2) failure to treat and punishment of symptoms; and (3) retaliation for raising complaints about conditions at MSOP.

### i. Improper Diagnostic Care

Mr. Larson's allegations related to diagnostic care appear to center around the theme that, until 2022, MSOP improperly diagnosed him with paraphilia (Not Otherwise Specified, hereinafter "NOS") to justify his involuntary confinement, while intentionally refusing to properly diagnose him with PTSD. (*Id.* ¶¶ 27-32; 48–50.) He asserts he does not have a sexual disorder and does not need sex-offender specific treatment. (*Id.* ¶ 60.)

Mr. Larson more specifically alleges Defendant Katie MacDowell, a clinical social worker, ignored certain mental health symptoms he exhibited on at least six occasions from 2010-2022. (*Id.* ¶¶ 40–41.) He states that she saw him eat feces and smear feces on himself and the walls on several occasions. He says she filed "incident reports" in response, but to his knowledge otherwise failed to report these instances to her supervisors, medical staff, or psychological services. (*Id.*)

In September or October 2017, Ms. MacDowell conducted a Mental Health Assessment and diagnosed Mr. Larson with "various conditions." (*Id.* ¶ 24.) Mr. Larson alleges he provided Ms. MacDowell with hospital records proving he had Traumatic Brain Injuries ("TBI") in the past, and that MSOP has been in possession of such documents since 2011 (*id.* ¶¶ 25–26). Mr. Larson further asserts he made an extensive list of all the physical and psychological trauma he had experienced and provided it to Ms. MacDowell as part of a request to be assessed for PTSD. (*Id.* ¶ 27.) According to Mr. Larson, Ms. MacDowell refused to look at the list or conduct an assessment, ignored or minimized the information he provided, and refused to properly diagnose him. (*Id.* ¶¶ 28–31.)

Mr. Larson alleges that from 2017 to 2022, Defendants Elizabeth Peterson, Gary Ankarlo, David Miles, Katie MacDowell, David Lindlbauer and Kayla Taylor diagnosed him with anti-social personality disorder, paraphilia (NOS), and chemical abuse disorder, without proper clinical support. (*Id.* ¶ 32.) Mr. Larson further contends these Defendants prepared or caused others to prepare deliberately false treatment records regarding his diagnoses, conduct, and treatment progress, but he does not specify which records allegedly were falsified, how they were falsified, or who falsified them. (*Id.* ¶ 33.)

On May 9 2022, Dr. Ankarlo diagnosed Mr. Larson with PTSD. (*Id.* ¶ 34.) Mr. Larson alleges that, with the exception of a TBI incurred in 2019, Dr. Ankarlo's diagnosis was based on the exact same documents and evidence Mr. Larson provided to Ms. MacDowell in 2017. (*Id.*) He states that, when asked to explain why she did not diagnose him with PTSD in 2017, Ms. MacDowell said he did not meet the requirements of a PTSD diagnosis because he did not have "total/complete flashbacks of the traumatic events." (*Id.* ¶ 38.) But Mr. Larson alleges, the "DSM-5 states otherwise." (*Id.*)

Mr. Larson further alleges Ms. Peterson is the only licensed psychologist with oversight over Plaintiff's assessments and reports, and that she is responsible for approving false diagnoses to keep him in MSOP treatment indefinitely. (*Id*. ¶ 51.) He says she has refused his repeated requests for psychological reassessments as required under accepted psychological practice. (*Id.*) Mr. Larson contends his PTSD was apparent from the outset of his detention at MSOP and complains that it took over 13 years to properly diagnose him. (*Id.* ¶ 49.)

### ii.    Failure to Treat and Punishment of Symptoms

Mr. Larson alleges Defendants' failure to diagnose him with PTSD until 2022 and the resulting denial of treatment for that condition has caused him "extensive physical and psychological harm and exacerbated his PTSD and other mental health conditions." (*Id.* ¶ 42.) He characterizes himself as disabled and alleges his symptoms from PTSD and other conditions include: difficulty performing manual tasks, such as writing, tying shoe laces, handling small items; virtual blindness in his right eye with little, if any, depth perception; fasting or overeating for days due to depressive and hopeless feelings; difficulty sleeping; eustachian tube dysfunction affecting his ability to balance; forgetfulness and memory issues; issues with eyesight and a cataract causing double vision; difficulty understanding other people's body language and emotions; anxiety; headaches; flashbacks; facial ticks; arrhythmia; malaise; panic attacks; an inability to regulate his own emotions, and suicidal ideation. (*Id.* ¶ 70.) Mr. Larson asserts that, as a result of his disabilities, he requires specialized care. (*Id.* ¶ 44.)

He identifies several occasions when Defendants rejected his requests for accommodations or treatment. He alleges that on October 6, 2022, he submitted a Client Request for Reasonable Modification under the ADA to be placed in a single cell to accommodate his PTSD. (*Id.* ¶ 54.) Defendants Gilpin and Boder denied that request. (*Id.* ¶ 55.) Mr. Larson further alleges he

requested a transfer to the MSOP facility in St. Peter. (*Id.* ¶¶ 62–64.) He states that, pursuant to MSOP policy, the St. Peter facility "houses clients with compromised executive functioning who may have cognitive impairments, traumatic brain injuries and/or learning disabilities preventing them from fully participating in conventional programming." (*Id.* ¶ 63.) He alleges Defendants Gilpin and Boder rejected his Request for Reasonable Modification, even though the documents he provided as part of that request "clearly prove" he qualifies for placement at St. Peter. (*Id.* ¶ 64, emphasis omitted.)

Mr. Larson states that two effective therapies for PTSD are Eye Movement Desensitization and Reprocessing ("EMDR") and neurofeedback (*see id.* ¶ 57), which he cannot obtain unless he is transferred. He claims he cannot receive EMDR or neurofeedback treatment at MSOP Moose Lake because very few employees at Moose Lake are "real" doctors or psychologists, and because the facility is not a licensed mental health treatment facility. (*Id.* ¶¶ 72–73.) According to Mr. Larson, the Minnesota Disability Law Center asked MSOP officials why they were refusing to provide EMDR or neurofeedback treatment for his PTSD. (*Id.* ¶ 65.) He alleges that, shortly thereafter, Defendants DHS, MSOP Jodi Harpstead, Nancy Johnston, Terrance Kneisel, Nicole Boder, Krista Gilpin and Andrew Christensen drafted and promulgated the MSOP policy "Eye Movement Desensitization and Reprocessing [EMDR] Therapy, Policy Number: 215-5025SP" ("EMDR Policy"). (*Id.* ¶ 66, capitalization omitted.) The EMDR Policy allows MSOP detainees to access EMDR treatment only if they: (1) reside at the St. Peter facility or in Community Preparation Services ("CPS"); (2) have progressed to Phase II or III of treatment at MSOP; and (3) have the support of their primary therapist and clinical supervisor. (*Id.* ¶ 67.)

Mr. Larson contends his PTSD makes it impossible for him to meet the prerequisites for treatment under the EMDR Policy. (*Id.* at ¶ 68.) To complete Phase I of MSOP treatment, a

detainee must go a full year or more without a single disciplinary Behavioral Expectation Report ("BER"). (*Id.* ¶ 61.) Mr. Larson claims that, as a result of Defendants' failure to properly treat his PTSD, he frequently engages in behaviors that result in BERs. (*Id.* ¶ 57.) In other words, Mr. Larson argues his misconduct is a symptom of his mental illness and that MSOP is refusing to treat his mental illness with his preferred treatment because of that misconduct.

Mr. Larson further alleges that, as a consequence of his behaviors resulting from PTSD, MSOP officials frequently punish him by placing him in solitary confinement (as part of High Security Area ("HSA") or Administrative Restriction ("AR") placement), where he has spent 12–13 of the 14-plus years of his detention at MSOP. (*Id.* ¶¶ 70, 88, 93.) He has thus been deprived of access to the gymnasium, multi-purpose rooms, craft room, all recreational activities, and all educational, vocational and employment programs. (*Id.* ¶ 57.) Mr. Larson alleges that during solitary confinement he is only allowed out of his cell for one hour a day, which further exacerbates his symptoms. (*Id.* ¶ 88.)

Mr. Larson contends that, instead of placing him in solitary confinement, MSOP should either transfer him to St. Peter, as discussed above, or place him in the Mental Health Unit ("MHU")—a unit for MSOP detainees with significant mental health concerns who do not meet the requirements for transfer to the hospital in St. Peter. (*See id.* ¶ 44.) He says MSOP has placed him in the MHU on three occasions: (1) for two months in 2011; (2) for roughly fourteen months from May 2014 to June 2015; and (3) around February 2022 when he received his PTSD diagnosis, which "qualified" him for such placement. (*Id.* ¶¶ 45–46.) But according to Mr. Larson, on August 28, 2022, DHS, MSOP and Defendants Harpstead, Johnston, Kneisel, Barry, Peterson, Ankarlo, Miles and MacDowell removed him from the MHU without any rationale or explanation, making it clear he will not be returned to the MHU. (*Id.* ¶ 47.)

8

Mr. Larson further claims he has been approved for MRI testing, TBI screening, neuropsychological assessment, and functional assessment testing for six years (*id.* ¶ 94), but DHS, MSOP, and Defendants Harpstead, Johnston, Kneisel, Barry, Peterson, Ankarlo, Miles, MacDowell, Lindlbauer, Taylor, Boder and Gilpin have refused to provide him such testing in response to behaviors stemming from his untreated PTSD.  (*Id.*)  Mr. Larson alleges that on June 1, 2023, Ms. Taylor informed him Ms. Peterson had refused to schedule neuropsychological assessments during his detention in HSA.  (*Id.* ¶ 95.)  He further alleges he has been in AR or HSA placement due to behaviors stemming from his improperly treated PTSD for 24 of the past 30 months, and that he has no control over when he will be released from such placement.  (*Id.* ¶¶ 95–96, 101.)

Mr. Larson alleges that on May 5, 2023, he informed Mr. Woods and the Adult Abuse Hotline of MSOP's refusal to provide him with the PTSD treatment he is entitled to receive. (*Id.* ¶ 79.)  He states he has not received any acknowledgment or response from either party.  (*Id.*)

### iii.    Retaliation

Mr. Larson also claims MSOP staff have retaliated against him in response to his complaints.  He claims Ms. Gilpin and Ms. Boder retaliated against him by deliberately omitting from their determination of his ADA Request for Reasonable Modification two pages of an incident report related to a TBI Mr. Larson incurred on January 19, 2019.  (*Id* ¶ 74.)  According to Mr. Larson, the omitted pages were medical documents demonstrating he was unconscious and could not remember what happened.  (*Id.*)  He further alleges they omitted part of a medical document related to a TBI he incurred on May 6, 1985, which stated he had "retrograde amnesia." (*Id.*)  According to Mr. Larson, the omitted documents were "highly relevant" to his ADA modification request.  (*Id.*)  Mr. Larson states that he filed an ADA Modification Appeal Request

with Mr. Christensen on November 16, 2023, and that Mr. Christiansen summarily denied his appeal as a result of these alleged omissions.  (*Id.* ¶ 76.)

Mr. Larson also contends MSOP officials regularly keep him in AR long after "any supposed investigation should have been completed."  (*Id.* ¶ 102.)  He claims they keep him there in order to inflict excessive and unnecessary deprivation "as and for punishment and in retaliation against Mr. Larson for the constant grievances and numerous lawsuits Mr. Larson has filed" regarding the conditions at MSOP.  (*Id.*)  Mr. Larson alleges that any time he protests his detention or "exhibits symptoms/manifestations of his PTSD," MSOP officials punish him by placing him in HSA solitary confinement, Behavioral Therapy Unit ("BTU-Omega") solitary confinement, or AR solitary confinement, or place him on an Individual Program Plan ("IPP").  He claims these actions are retaliatory and based on "false allegations of, and pending investigations of alleged 'criminal' activity."  (*Id.* ¶ 81.)

### iv.    Claims and Relief Sought

Mr. Larson asserts 10 claims: (1)  violations of due process – unlawful punishment; (2) First Amendment retaliation; (3) failure to train and supervise; (4) Americans with Disabilities Act ("ADA") disability discrimination; (5) Rehabilitation Act ("RA") discrimination; (6) Minnesota Human Rights Act ("MHRA") – failure to provide accommodations; (7) ADA – retaliation; (8) denial of treatment for a serious medical need; (9) negligent failure to comply with Minn. Stat. §§ 253B, 253D and 144.651; and (10) various supplemental state torts, including malicious prosecution, defamation, misrepresentation, abuse of process, false imprisonment, negligence, infliction of emotional distress, assault, battery and fraud.  (ECF No. 30 ¶¶ 120–160.)  Each claim incorporates every allegation Mr. Larson makes in his Amended Complaint.  (*See id.*)  Mr. Larson asserts Counts 1–2 and 7–10 against all Defendants.  (*Id.* ¶¶ 121, 124, 149, 152, 155, 159.)  He

asserts Count 3 against Defendants DHS, MSOP, Jodi Harpstead, Nancy Johnston, Terrance Kneisel, John Barry, Elizabeth Peterson, Blake Carey, David Miles and Katie MacDowell. (*Id.* ¶ 127). And he brings Counts 4–6 against only Defendants DHS and MSOP. (*Id.* ¶¶ 130–147.)

For relief, Mr. Larson seeks: (1) a declaratory judgment that all Defendants violated his constitutional rights; (2) injunctive relief requiring the DHS Defendants to provide him with a variety of neuropsychological assessments and screenings; (3) injunctive relief requiring Defendants DHS, MSOP, Jodi Harpstead, Nancy Johnson and Terrance Kneisel to petition the Special Review Board to either discharge Mr. Larson from his commitment as a "sexually dangerous person" or commit him "as mentally ill and/or mentally ill and dangerous;" (4) injunctive relief requiring Defendants MSOP, Jodi Harpstead, Nancy Johnston and Terrance Kneisel to transfer Mr. Laron to the Minnesota Security Hospital in St. Peter to receive PTSD treatment; (5) injunctive relief requiring all DHS and MSOP employees to cease punishing Mr. Larson for exhibiting PTSD and other mental health symptoms (with "BERs, HSA, Restrictions, criminal allegations, etc."); (6) compensatory and punitive damages; (7) attorneys' fees;[2] (8) an order stating that any money Mr. Larson receives from this lawsuit is exempt from collection by the State of Minnesota in connection with billing for the costs of his care; and (9) any other relief the Court deems appropriate. (ECF No. 30 at 30–31.)

II. **Legal Standards**

A. **Pleading Requirements**

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that a complaint must include "a short plain statement of the claim showing the pleader is entitled to relief ...." Fed. R. Civ. P. 8(a)(2). Though Rule 8(a)(2) does not require detailed factual allegations, "it demands

---

[2] Mr. Larson is not represented by an attorney.

more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Rule 11(b) places additional requirements on pleadings filed either by "an attorney or unrepresented party." Fed. R. Civ. P. 11(b). Any party who files "a pleading, written motion, or other paper ... [with the Court] certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... [that] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* at 11(b)(3).

Taken together, "[i]t is the plaintiffs' burden, under both Rule 8 and Rule 11, to reasonably investigate their claims, to research the relevant law, to plead only viable claims, and to plead those claims concisely and clearly, so that a defendant can readily respond to them and a court can readily resolve them." *Gurman v. Metro Hous. Dev. Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011). Courts in the District of Minnesota have "repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant." *Id.* at 1153 (collecting cases). Such complaints shift "onto the defendant and the court the burden of identifying the plaintiff's genuine claims and determining which of those claims might have legal support." *Id.* Most problematically for plaintiffs filing 'kitchen-sink' complaints, it becomes nearly impossible for the court to discern whether they state viable claims for relief, because their allegations become "wreathed in a halo of frivolous and near-

frivolous legal claims. The bad obscures the good." *Id.* at 1154; *see also, e.g.*, *White v. Dayton*, 11-cv-03702 (NEB/DJF), 2023 WL 21918, at *3 (D. Minn. Jan. 3, 2023) (noting that when plaintiffs "impute nearly every action in the Complaint to every Defendant, it is impossible for the Court to determine from the pleadings which of the allegations it should construe literally, and which it should assume result from sloppy draftsmanship").

### B.    Rule 12(b)(6) Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is appropriate when a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Courts exclude from consideration all "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements ...." *Iqbal*, 556 U.S. at 578. In addition to the allegations in the complaint, a court deciding a motion to dismiss under Rule 12(b)(6) may consider matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

### III.    Analysis

### A.    The Woods Motion to Dismiss

Mr. Woods seeks to dismiss the entirety of Mr. Larson's claims against him. (*See* ECF No. 60; ECF No. 30 ¶¶ 12–25, 148–60.) Mr. Woods argues that, during the course of the events

described in the Amended Complaint, he was not an employee at DHS or MSOP, but merely a regional ombudsman at the Office of Ombudsman for Mental Health and Developmental Disabilities.  (ECF No. 60 at 2, quoting ECF No. 30 ¶ 18.)   According to Mr. Woods, the Ombudsman is an appointee of the Governor, and the Ombudsman hires regional ombudsmen such as himself for assistance.  (ECF No. 60 at 2, citing Minn. Stat. §§ 245.91–.97 (2022).)   The Ombudsman's authority is established by statute, and these powers include mediating or advocating on behalf of persons served by state agencies or programs for treatment of mental illnesses, amongst other ailments.  (*Id.*, citing Minn. Stat. §§ 245.91, 245.94.)  The Ombudsman "may investigate the quality of services provided to clients," and at the request of a client, "may gather information and data about and analyze, on behalf of the client, the actions of an agency, facility, or program."  (*Id.* at 2–3, quoting Minn. Stat. § 245.94, subd. 1(d), (e).)  The Ombudsman may receive complaints concerning agency, program or facility actions, and if he determines that a complaint reveals a problem, he may make recommendations to the agency, program or facility.  (*Id.* at 3, citing Minn. Stat. § 245.94, subd. 3, 4.)  The Ombudsman lacks licensing or regulatory authority, however.   (*Id.*, citing Minn. Stat. § 245.94.)

Mr. Woods argues many of Mr. Larson's allegations against him are conclusory and improperly conflate him with the DHS Defendants.  (*Id.*, citing ECF No. 30 ¶¶ 100, 104–117.)  He points to Mr. Larson's allegation that all Defendants are "mandatory reporters" (*id.*, citing ECF No. 30 ¶ 23), and states that under Minnesota law he is not such a reporter (*id.* at 3 n.1, citing Minn. Stat. § 626.5572 (2022)).  Mr. Woods notes that the only specific allegation against him in the Amended Complaint is Mr. Larson's claim that, in May 2023, Mr. Larson informed Mr. Woods of MSOP's refusal to provide Mr. Larson with PTSD treatment, and that Mr. Woods failed to respond or acknowledge Mr. Larson's report.  (*Id.*, citing ECF No. 30 ¶ 79.)

Mr. Woods contends the claims against him must be dismissed on the grounds that: (1) Mr. Larson lacks standing to bring his claims against Mr. Woods; (2) Mr. Woods' alleged failure to acknowledge or respond to Mr. Larson's complaint of maltreatment is not actionable under any of the asserted causes of action; (3) sovereign immunity bars Mr. Larson's official capacity claims against Mr. Woods; and (4) the Court should dismiss Mr. Larson's individual capacity claims against Mr. Woods based on Mr. Woods' lack of personal involvement and the doctrine of qualified immunity. (*See generally* ECF No. 60.) For the reasons given below, the Court recommends granting Mr. Woods' Motion to Dismiss.

### i.   Official Capacity Claims

The Eleventh Amendment of the United States Constitution "entitles states to sovereign immunity, which prevents any federal court from exercising jurisdiction over a lawsuit against a state." *Daywitt v. Harpstead*, 21-cv-1848 (WMW/DTS), 2022 WL 2374133, at *2 (D. Minn. June 30, 2022) (citing U.S. Const. amend. XI; *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)), *aff'd*, No. 22-2484, 2022 WL 16985820 (8th Cir. Nov. 17, 2022). Sovereign immunity bars a plaintiff from seeking monetary damages against a state, its officers, or its agencies in federal court absent consent from the state or congressional abrogation of immunity. *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *Doe v. Nebraska*, 345 F.3d 593, 597 (8th Cir. 2003)). "A suit against state employees in their official capacities is the functional equivalent of a suit against the State." *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012).

The *Ex Parte Young* doctrine provides an exception to sovereign immunity when plaintiffs seek prospective injunctive relief against state officials sued in their official capacities. *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018). Determining whether the *Ex Parte Young* exception

applies is relatively straightforward. "First, the Court asks whether the complaint alleges an ongoing violation of federal law.… Additionally, the defendant for whom the *Ex Parte Young* exception is sought must have 'some connection to the enforcement of the challenged laws.'" *Meyer v. Stacken*, 17-cv-1761 (ADM/KMM), 2019 WL 4675353, at *2 (D. Minn. July 25, 2019) (quoting *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017)), *report and recommendation adopted*, 2019 WL 4673941 (D. Minn. Sept. 25, 2019). "However, 'that connection does not need to be primary authority to enforce the challenged law …. Nor does the [state official] need to have full power to redress a plaintiff's injury in order to have some connection with the challenged law.'" *Id.* (quoting *281 Care Committee v. Arneson*, 638 F.3d 621, 632–33 (8th Cir. 2011)). "If the Court determines that the complaint alleges an ongoing violation of federal law and the state official in question has 'some connection' with the challenged law, then it moves to the second part of the *Ex Parte Young* inquiry: whether the complaint requests prospective injunctive relief." *Id.* (quoting *281 Care Committee*, 638 F.3d at 632).

Mr. Woods is an employee of the State of Minnesota (*see* ECF No. 30 ¶ 18), and Mr. Larson points to no information suggesting the State has waived its sovereign immunity with respect to his claims. Mr. Larson's claims against Mr. Woods in his official capacity thus are barred by sovereign immunity to the extent that he seeks compensatory or punitive damages.

Furthermore, Mr. Larson does not bring his requests for specific prospective injunctive relief against Mr. Woods (*see* ECF No. 30 at 30–31, naming only DHS, MSOP and certain MSOP employees in his requests for specific relief), and in any event, most of the injunctive relief Mr. Larson requests falls outside the scope of Mr. Woods' authority to provide as a regional ombudsman, *see* Minn. Stat. § 245.94. To the extent Mr. Larson requests a broad injunction prohibiting Mr. Woods from violating his rights (*see* ECF No. 30 at 30), the Court cannot grant

16

the relief Mr. Larson seeks because any such injunction would violate the specificity requirement of Federal Rule of Civil Procedure 65(d). *See* Fed. R. Civ. P. 65(d) (providing that an injunction must "describe in reasonable detail … the act or acts restrained or required"); *Calvin Klein Cosmetics Corp. v. Parfums de Couer, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987) ("Broad language in an injunction that essentially requires a party to obey the law in the future is not encouraged and may be struck from an order for injunctive relief, for it is basic to the intent of Rule 65(d) that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits."). For these reasons, the Court finds Mr. Larson has not asserted a viable claim against Mr. Woods for prospective injunctive relief. Because sovereign immunity bars Mr. Larson's official capacity claims against Mr. Woods for compensatory and punitive damages, and Mr. Larson has not asserted a cognizable claim against Mr. Woods for prospective injunctive relief, the Court recommends all claims against Mr. Woods in his official capacity be dismissed.

### ii.    Individual Capacity Claims

To maintain a Section 1983 claim against a defendant in his personal capacity, a plaintiff must plead sufficient facts to support a finding that the defendant was personally involved in an alleged unconstitutional act. *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001). "[I]t is not enough for a plaintiff seeking relief from a defendant in the defendant's individual capacity to allege that his rights were violated; the plaintiff must allege that his rights were *violated by the defendant*." *Pittman v. Swanson*, 11-cv-3658 (PJS/TNL), 2023 WL 2404044, at *2 (D. Minn. Jan. 27, 2023), *report and recommendation adopted*, 2023 WL 2238703 (D. Minn. Feb. 27, 2023) (emphasis in original). To be afforded the usual presumption of truth at the pleading stage, those

allegations must be plausible.  *See Twombly*, 550 at U.S. at 570.  As discussed in greater detail below, Mr. Larson has not plausibly pled individual capacity claims against Mr. Woods.

### a.    Count 1 – Unlawful Punishment

Mr. Larson alleges that, along with the other Defendants, Mr. Woods violated his Fifth, Eighth and Fourteenth Amendment protections by subjecting Mr. Larson to conditions of civil commitment that constitute unlawful punishment.  (ECF No. 30 ¶ 121.)  As a threshold matter, Mr. Larson's Eighth Amendment claim fails as a matter of law because the "Eighth Amendment applies only to persons who are in custody as punishment for a criminal conviction." *Housman v. Jesson*, 15-cv-2209 (PAM/HB), 2016 WL 7231600, at *3 (D. Minn. Dec. 14, 2016) (citing *Semler v. Ludeman*, 09-cv-732 (ADM/SRN), 2010 WL 145275, at *22 (D. Minn. Jan. 8, 2010)).  Mr. Larson is confined at MSOP under a civil commitment, and as a civil detainee he cannot avail himself of the protections afforded under the Eighth Amendment.

A civil detainee can, however, challenge his conditions of confinement under the Fourteenth Amendment.  *Id.* (citing *Holly v. Anderson*, 04-cv-489 (JMR/FLN), 2008 WL 1773093, at *5 (D. Minn. Apr. 15, 2008)).[3]  Mr. Larson's Fourteenth Amendment unlawful punishment claim against Mr. Woods nevertheless fails for a different reason:  He does not plausibly allege Mr. Woods was personally involved in any way in determining where to detain him within the MSOP, in causing him to be placed in solitary confinement, or in deciding how to respond to the behavioral issues he alleges are a product of PTSD.  The lack of any allegation suggesting Mr.

---

[3] Because Mr. Larson is a detainee of the State of Minnesota and not the federal government, his due process challenge arises under the Fourteenth Amendment; not the Fifth Amendment.  *See, e.g., Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (stating that the Fourteenth Amendment establishes due process rights for state pretrial detainees just as the Fifth amendment gives federal pretrial detainees the same rights).

Woods was personally involved in determining his punishment is fatal to his unlawful punishment claim against Mr. Woods.

### b.    Counts 2 and 7 – First Amendment Retaliation and ADA Retaliation

Mr. Larson also alleges Mr. Woods and other Defendants retaliated against him for expressing grievances and filing lawsuits challenging his alleged mistreatment at MSOP by: (1) placing him in units that did not accommodate his disabilities; (2) forcing him to repeatedly move himself and his belongings; (3) depriving him of necessary treatment; (4) depriving him of the benefits and use of programs and services at MSOP; and (5) discriminating against him and interfering with his ability to assert his rights under the ADA (ECF No. 30 ¶¶ 124, 149).  But Mr. Larson does not allege facts suggesting Mr. Woods played any role in MSOP's placement, treatment or programming decisions, or in processing his requests for accommodation under the ADA.  Mr. Larson alleges he complained to Mr. Woods about MSOP's failure to treat his PTSD and received no response.  (ECF No. 30 ¶ 79.)  The Court cannot plausibly infer from this allegation that Mr. Woods acted or failed to act with retaliatory motives, and since Mr. Larson does not allege Mr. Woods had any personal involvement in the actions he characterizes as retaliatory, the Court recommends dismissing these claims.

### c.    Count 8 – Denial of Medical Treatment

Mr. Larson's claim that Mr. Woods deliberately disregarded his medical needs (ECF No. 30 ¶ 152) fails for similar reasons.  To state such a claim, a plaintiff must establish that he suffers from "an objectively serious medical need." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (citing *Scott v. Benson*, 740 F.3d 335, 339–40 (8th Cir. 2014)).  "To be objectively serious, a medical need must have been 'diagnosed by a physician as requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Id.*

(quoting *Scott*, 740 F.3d at 339–40). He must then show that the defendant "actually knew of but deliberately disregarded his serious medical need." *Id.* (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). "This showing requires a mental state 'akin to criminal recklessness.'" *Id.* (quoting *Coleman*, 114 F.3d at 784).

As with the counts previously discussed, this count fails because Mr. Larson does not adequately allege facts from which the Court can plausibly infer Mr. Woods had personal involvement. The core of this claim is MSOP's alleged failure to provide Mr. Larson with adequate treatment for his PTSD. Mr. Woods has statutory authority to make recommendations to MSOP regarding Mr. Laron's treatment, *see* Minn. Stat. § 245.95, subd. 4, but the Court cannot infer that Mr. Woods—who is not an MSOP or DHS employee—had the power to actually determine Mr. Larson's mental health treatment. This claim should be dismissed for these reasons.

### d.    Counts 9 and 10 – State Law Claims

Mr. Larson alleges Mr. Woods and the other Defendants were negligent in: (1) failing to comply with their statutory duties; (2) failing to provide Mr. Larson with appropriate healthcare; (3) infringing on his personal privacy; and (4) infringing on his right to be free from physical restraint and isolation except in emergency situations. Mr. Larson further alleges Defendants committed a litany of state torts against him, including: (1) malicious prosecution; (2) defamation; (3) misrepresentation; (4) abuse of process; (5) false imprisonment; (6) professional negligence; (7) negligence per se; (8) intentional, reckless and negligent infliction of emotional distress; (9) assault; (10) battery; and (11) fraud. (ECF No. 30 ¶¶ 155–60.) He pled this morass of undifferentiated claims against Mr. Woods and all other Defendants jointly, without tying any of the defendants to any particular cause of action or explaining what any given defendant was alleged to have done to give rise to that cause of action. (*Id.*)

20

This kitchen-sink style of pleading, which seeks to bring every conceivable claim against every conceivable defendant, runs afoul of the pleading requirements of Rule 8(a).  *See Gurman*, 842 F. Supp. 2d at 1153–54.  It is simply impossible to tell from Counts 9 and 10 what actions Mr. Larson believes Mr. Woods took to violate any of the state rights asserted.  Moreover, the Ombudsman for Mental Health and Developmental Disabilities and his designees' investigative and reporting functions are only discretionary in nature and "not statutorily imposed."  *Kunshier v. Minnesota Sex Offender Program*, No. A09-0133, 2009 WL 3364217, at *8 (Minn. Ct. App. Oct. 20, 2009).  And employees of the state of Minnesota are immune from compensating personal injuries or property loss if the "loss is caused by the … failure to perform a discretionary duty, whether or not the discretion is abused …."  Minn. Stat. 3.736, subd. 3(b).  Mr. Larson fails to assert any colorable state law claim against Mr. Woods for these reasons.  The Court thus recommends Mr. Larson's claims against Mr. Woods be dismissed and that the Woods Motion to Dismiss be granted in its entirety.

### B.    The DHS Motion to Dismiss

The DH Defendants seek to dismiss the entirety of the Amended Complaint.  (*See generally* ECF No. 68.)  They contend all of Mr. Larson's claims should be dismissed because: (1) the Amended Complaint does not meet the pleading requirements of Rule 8(a); (2) each count of the Amended Complaint fails to state a claim for relief; (3) Mr. Larson fails to adequately plead the personal involvement of any DHS Defendant for purposes of his individual capacity claims; (4) the individual DHS Defendants are entitled to qualified immunity for purposes of their individual capacity claims; (5) any claim for damages against the DHS Defendants in their official capacities is barred by the Eleventh Amendment; (6) all claims against DHS and MSOP should be dismissed under the Eleventh Amendment and because MSOP is not an entity amendable to suit; and (7) to

the extent any state law claims remain in this lawsuit, the Court should decline to exercise supplemental jurisdiction over those claims (*see generally* ECF No. 68). For the reasons given below, the Court recommends granting in part and denying in part the DHS Motion to Dismiss.

### i.    Section 1983 Claims Against DHS and MSOP

Mr. Larson's Section 1983 claims against DHS are barred by the Eleventh Amendment. As a legal entity of the State, DHS is entitled to sovereign immunity, which it has not waived under Section 1983. *See Cooper v. Minn. Dep't of Human Servs.*, 15-cv-2682, 2016 WL 11491392, at *6 (D. Minn. Apr. 25, 2016) ("As a state agency, the DHS enjoys Eleventh Amendment immunity, and Cooper has not identified any Congressional abrogation of that immunity."), *report and recommendation adopted*, 2016 WL 4179867 (D. Minn. Aug. 8, 2016); *Deretich v. Off. of Admin. Hearings, State of Minn.*, 798 F.2d 1147, 1154 (8th Cir. 1986) (finding Minnesota state agencies were entitled to sovereign immunity and immune from suit under section 1983). Mr. Larson's Section 1983 claims against DHS (Counts 1, 2, 3 and 8) should be dismissed accordingly.

Mr. Larson's claims against MSOP are subject to dismissal for a different reason: It is "not a suitable entity" for suit, as it is merely "a program that DHS established and maintains." *Sorenson v. Minnesota*, 21-cv-671 (NEB/LIB), 2021 WL 6335107, at *3 (D. Minn. Sept. 13, 2021) (citing Minn. Stat. § 246B.02). The Court may dismiss claims against a defendant if that defendant is not a legal entity with the capacity to be sued. *Id.* (citing *Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475, 477–78 (8th Cir. 2001).) The Court recommends dismissing Mr. Larson's claims against MSOP in their entirety on that ground.

### ii.    Qualified Immunity

The DHS Defendants raise a boilerplate qualified immunity argument that does not address any claim or Defendant at an individual level (*see* ECF No. 16 at 22–23). Their argument lacks

the specificity required for the Court to review this defense. The defense is, in any event, premature at this stage in the proceedings because the record is not sufficiently developed for the Court to evaluate its applicability. *See, e.g.*, *Alberson v. Arkansas Dep't of Correction*, 4:04-cv-01453 (WRW) 2005 WL 8164889, at *3 (E.D. Ark. Feb. 15, 2005) (finding it was "impossible to determine" at the motion to dismiss stage "whether qualified immunity would apply" and stating the defendants were "free to assert a qualified immunity defense later"). The Court thus rejects the defense as grounds for dismissal at this stage in the litigation but directs that the DHS Defendants may assert it again later in the proceedings when the record is more developed.

### iii.    Official Capacity Damages Demand

Mr. Larson's demand for damages against the DHS Defendants in their official capacities fails for the same reason that this demand fails as asserted against Mr. Woods: all DHS Defendants are employees of the State of Minnesota. As discussed previously, a suit against state employees in their official capacities equates to a suit against the state itself. *Zajrael*, 677 F.3d at 355. Since the State of Minnesota is immune from official capacity suits seeking damages, *Daywitt*, 2022 WL 2374133, at *2 (citation omitted), Mr. Larson's demand for damages against the DHS Defendants in their official capacities should be dismissed. Under the *Ex Parte Young* doctrine, however, sovereign immunity does not apply to Mr. Larson's demand for prospective injunctive relief against the DHS Defendants in their official capacities. *McDaniel*, 897 F.3d at 952. The Court addresses those claims in greater detail below.

### iv.    Count 1: Unlawful Punishment

Mr. Larson alleges the individual DHS Defendants violated his rights under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution by subjecting him to unlawful punishment. (ECF No. 30 ¶ 121.) As discussed previously, Mr. Larson's claim is

properly analyzed under the Fourteenth Amendment and not the Eighth or the Fifth Amendments. *See Housman*, 2016 WL 7231600 at *3; *Walton*, 752 F.3d at 1117.  To establish a due process violation under the Fourteenth Amendment based on conditions of confinement, a civilly-committed person must establish that the conditions of his confinement amount to punishment. *Housman*, 2016 WL 7231600 at *3.  If a particular condition is reasonably related to a legitimate government objective, it does not amount to punishment.  *Id.*

### 1.    Individual Capacity Claims

The Amended Complaint alleges Mr. Larson spent significant amounts of time in various forms of restrictive and solitary confinement as punishment for exhibiting PTSD symptoms, and that as a result, he was deprived of access to the gymnasium, multi-purpose rooms, craft room, and all recreational, educational, vocational and employment programming.  (ECF No. 30 ¶ 57–58.)  Mr. Larson asserts his unlawful punishment claim collectively against all Defendants, however.  (ECF No. 30 ¶ 121.)  He does not describe any specific instance of punishment, identify the circumstances or behaviors that preceded the punishment, or describe how any of the individual DHS Defendants was personally involved in delivering such punishment.  His generalized allegations that the DHS Defendants have harmed him throughout the years do not adequately establish their personal involvement.  The Court recommends dismissing Mr. Larson's unlawful punishment claim against the DHS Defendants in their individual capacities on that basis.

### 2.    Official Capacity Claims

The remainder of Count 1 consists of Mr. Larson's claim for prospective injunctive relief against the individual DHS Defendants in their official capacities.  To the extent he alleges that the imposition of solitary confinement on MSOP detainees alone constitutes unlawful punishment, that theory is precluded by *Karsjens*.  *See Karsjens v. Harpstead*, 11-cv-3659, 2022 WL 542467,

at *18 (D. Minn. Feb. 23, 2022) (citing *Larson v. Jesson*, 11-cv-2247 (PAM/LIB), 2018 WL 3352926, at *5 (D. Minn. July 9, 2018) (holding that "placement in administrative segregation is not a constitutional deprivation actionable under § 1983")).  However, the Amended Complaint challenges not just the fact of Mr. Larson's solitary confinement, but also the total time and the cause for such confinement.  According to Mr. Larson, he has spent 12 to 13 of the past 14 years in solitary confinement as punishment for manifesting symptoms of PTSD (*see* ECF No. 30 ¶¶ 70, 94), a condition that went undiagnosed for many years and for which he received no treatment during that period (*id.* ¶ 42).  Mr. Larson asserts he has spent 24 of the last 30 months in solitary confinement (*id.* ¶ 101).  He further claims that, while he is in solitary confinement, he is "locked in a cell 23 hours a day, 7 days a week" and is denied access to facilities, programs, and mental health services (*id.* ¶¶ 92, 95).  He claims that, as the result of the substantial time he has spent in solitary confinement, he experiences flashbacks, arrythmia, an eating disorder, recurring nightmares, nights sweats, and greatly exacerbated symptoms of PTSD and depression (*id.* ¶ 85).

In *Karsjens II*, the Eighth Circuit explained that "civilly committed individuals may [not] be punished without running afoul of the Fourteenth Amendment."  988 F.3d at 1052 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).  "In analyzing whether a condition of confinement is punitive, courts 'decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Karsjens*, 988 F.3d at 1052 (quoting *Bell*, 441 U.S. at 538).  And although Mr. Larson's solitary confinement is not *per se* unconstitutional, the manner and length of his confinement might make it so.  As the Supreme Court held in *Hutto v. Finney*, "punitive isolation is not necessarily unconstitutional, but it may be, depending on the duration of the confinement and the conditions thereof."  437 U.S. 678, 686 (1978) (internal quotations omitted).  Other relevant factors include "the size of the cell, time spent

25

in the cell, and lack of opportunities for exercise and recreation." *See Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981).

Mr. Larson concedes that MSOP regularly places him in solitary confinement in response to his behavior (*see* ECF No. 30 ¶ 70), and this fact ultimately may demonstrate a legitimate government purpose for using such confinement. But at this early state of the litigation the Court must draw all reasonable inferences in favor of Mr. Larson, and in light of his *pro se* status, the Court finds Mr. Larson has alleged facts sufficient to support an inference that his solitary confinement is not reasonably related to a legitimate government objective, such that it constitutes unlawful punishment. These alleged facts include: the extraordinary length of time Mr. Larson alleges he has spent in solitary confinement; the allegation that his confinement constitutes punishment in response to behaviors resulting from his mental illness; the nature of the restrictions on his access to programming and resources during his confinement; and his allegation that the DHS Defendants have withheld mental health assessments and treatments during his confinement. Because the Court finds Mr. Larson has plausibly pled a claim of unlawful punishment against the DHS Defendants in their official capacities, it recommends allowing this claim to proceed insofar as he seeks declaratory and injunctive relief.

### v.    Count 2: First Amendment Retaliation

Mr. Larson alleges the individual DHS Defendants violated his First Amendment rights by retaliating against him for stating objections to mistreatment. (ECF No. 30 ¶ 124.) To plausibly plead a First Amendment retaliation claim, Mr. Larson must allege that: (1) he engaged in constitutionally protected activity; (2) the DHS Defendants took adverse action against him that would "chill a person of ordinary firmness from continuing in the activity"; and (3) the DHS Defendants took the adverse action *because of* Mr. Larson's protected activity. *Sorenson v.*

*Minnesota*, 21-cv-671, 2021 WL 6335107, at *5 (D. Minn. Sept. 13, 2021) (quoting *Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 943 (8th Cir. 2016)).

Mr. Larson claims he engaged in protected activity by "expressing grievances … both verbally and through written correspondence," and by filing "previous lawsuits against MSOP and DHS officials." (ECF. No. 30 ¶¶ 71, 124.) Though Mr. Larson does not identify any previous lawsuits that might have prompted retaliation, he claims he wrote a "Client Request" on November 26, 2022 confronting Ms. McDowell about her failure to diagnose him with PTSD. (ECF No. 30 ¶ 38.) He also alleges he wrote a request to Ms. Peterson on December 9, 2022 asking whose license Ms. McDowell worked under. (ECF No. 30 ¶ 39.) He contends Ms. Peterson has "repeatedly denied" his "numerous requests for reassessment of his psychological conditions." (ECF No. 30 ¶ 50.) He further alleges that on October 6, 2022, he submitted a "Client Request for Reasonable Modification" under the ADA requesting a single cell "due to his PTSD." (ECF No. 30 ¶ 54.) While the precise contours of the speech at issue are not entirely clear at this juncture, the Court finds Mr. Larson has provided sufficient detail to plead that he engaged in constitutionally protected activity.

The Court also finds Mr. Larson alleges retaliatory acts that could have had a chilling effect. Mr. Larson claims such retaliation included: his continued placement in units that did not accommodate his disabilities; forcing him to repeatedly move himself and his belongings; depriving him of necessary medical treatment; and depriving him of access to MSOP programs, services, and benefits. (ECF No. 30 ¶ 124.) These deprivations, if in fact they occurred, are

sufficient to raise a question of fact as to whether they would cause a person "of ordinary firmness" to hesitate to continue speaking out.[4]

The Court nevertheless recommends dismissing Mr. Laron's First Amendment claim because the Amended Complaint lacks any basis in fact from which a connection between the protected activity and the alleged retaliatory conduct reasonably might be inferred. He alleges in conclusory fashion that Ms. Gilpin and Ms. Boder have taken retaliatory actions against him in response to his complaints of maltreatment (ECF No. 30 ¶ 71), but such conclusory statements are insufficient to meet the pleading requirements of Rule 8(a). *Iqbal*, 556 U.S. at 678. Mr. Larson does not point to any particular occasion on which a decision to place him in solitary confinement or otherwise deprive him of access to programming or treatment was a response to a particular lawsuit or grievance he asserted. He further fails to identify any written or verbal communication—by Ms. Gilpin, Ms. Boder, or any other DHS Defendant—from which retaliatory motives might be ascribed. Mr. Larson himself concedes his placement in solitary confinement and the resulting deprivation of access to treatment and programs has resulted from his own out-of-control behavior. (*See, e.g.,* ECF No. 30 ¶ 70, "Mr. Larson is unable to regulate his emotions,

---

[4] To the extent Mr. Larson alleges the omission of information from his ADA Request for Reasonable Modification appeal file constitutes "retaliation" (*see* ECF No. 30 ¶¶ 74, 75), the Court does not agree such an alleged omission would chill an ordinary person from continuing his protected speech. The ordinary-firmness test is objective; not subjective. *See Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020) (holding the BOP's denial of administrative remedy forms did not constitute retaliatory action under the First Amendment when it had no impact on prisoner's ability to continue using the administrative and judicial grievance processes available to him). "The ordinary-firmness test is designed to weed out trivial matters from substantial violations of the First Amendment." *Id.* Mr. Larson does not claim that MSOP in any way obstructed or discouraged him from filing additional accommodation requests or challenging the denial of his grievances in court. Instead, his challenge goes to whether MSOP denied his appeal based on all the information he believes was relevant, and thus the merits of the ADA decision itself. Though his challenge might establish an actionable claim for accommodation under the ADA, it does not establish actionable retaliation. *See Ehlers v. Univ. of Minnesota,* 18-cv-2794 (PJS/TNL), 2021 WL 663730, at *20 (D. Minn. Feb. 19, 2021).

which in turn makes it very difficult for him to control his behavior when agitated or provoked, which in turn causes MSOP employees to punish him.")  The Court thus need not accept as true Mr. Larson's conclusory assertion that the treatment he complains of was a retaliatory response to the various lawsuits and grievances he has filed.  *Hanten*, 183 F.3d 799 at 805.  The Court recommends Mr. Larson's First Amendment claim be dismissed on these grounds.

### vi.    Count 3: Failure to Train and Supervise

Mr. Larson alleges DHS, MSOP, and Defendants Harpstead, Johnston, Kneisel, Barry, Peterson, Carey, Miles, and MacDowell discriminated against him by failing to train or supervise other Defendants and MSOP employees with respect to his rights, and in particular, his right to medical care.  (ECF No. 30 ¶ 128.)  To establish these Defendants are liable under Section 1983 for failure to provide adequate training or supervision, Mr. Larson must show that: (1) the Defendants had notice of a pattern of unconstitutional acts committed by subordinates; (2) they were deliberately indifferent to, or tacitly authorized, those acts; (3) they failed to take sufficient remedial action; and (4) that failure proximately caused his alleged injuries.  *Flores v. Moser*, 16-cv-1860 (ADM/KMM), 2019 WL 2016789, at *9 (D. Minn. Jan. 7, 2019) (quoting *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012)).  The Amended Complaint must show that the Defendants "had notice that training procedures and supervision were inadequate and would likely cause a constitutional violation."  *Id.*

Mr. Larson's Amended Complaint fails to satisfy these requirements.  The only non-conclusory allegations he makes that relate to deficient training or supervision are that Ms. MacDowell misdiagnosed his PTSD, that she is not a licensed psychologist, and that she works under another employee's license.  (ECF No. 30 ¶¶ 35–39.)  These claims imply that Ms. McDowell, a licensed clinical social worker (ECF No. 30 ¶ 36), does not have the training

necessary to properly diagnose metal disorders. But Mr. Larson alleges no basis from which the Court might infer Ms. McDowell's training as a licensed clinical social worker disqualifies her from diagnosing mental illness.[5] Moreover, the Amended Complaint fails to allege that any Defendant was aware of a pattern of unconstitutional conduct—by Ms. McDowell or any other MSOP employee—and failed to address it. Mr. Larson alleges Courtney Menten is Ms. McDowell's supervisor, but Ms. Menten is not a named defendant in this action (*see* ECF No. 30 ¶¶ 35–39), and the Amended Complaint includes no allegation regarding anything Ms. Menten may have done or failed to do. Because Mr. Larson does not identify any Defendant who had notice of inadequate training procedures or supervision practices that were likely to cause a constitutional violation, the Court recommends dismissing this claim.

### vii.    Counts 4–6: Disability Discrimination

Mr. Larson brings claims against DHS and MSOP under the ADA, the RA, and the MHRA for denying him "full and equal use of, and benefit from, the programs, services, benefits and activities of MSOP because of his disabilities and by failing to accommodate his disabilities." (ECF No. 30 ¶¶ 134, 138–40, 144–47.) He identifies PTSD, cognitive impairments, traumatic brain injury and learning disabilities as conditions supporting his claims. (*See* ECF No. 30 ¶¶ 61-65.) As previously discussed, Mr. Larson's claims against MSOP must be dismissed because it is not a legal entity with the capacity to be sued. DHS is subject to potential suit under these statutes, however. *See, e.g.*, *Elston v. Collins*, No. 2:18-CV-19 RLW, 2018 WL 3489591, at *2 (E.D. Mo. July 19, 2018) (holding Missouri Department of Corrections' sovereign immunity was abrogated

---

[5] Mr. Larson appears to believe that because Dr. Ankarlo reached a different diagnosis five years later (*see* ECF No. 30 ¶ 34), Ms. McDowell necessarily was incompetent. But the inference Mr. Larson appears to draw discounts reasonable differences in professional judgment and the very real possibility that his condition might have changed during that five-year period. Indeed, Mr. Larson himself alleges solitary isolation has exacerbated his PTSD symptoms. (*Id.* ¶ 85.)

with respect to prisoner's ADA accommodation claim) (citing *United States v. Georgia*, 546 U.S. 151 (2006) (holding that "Title II [of the ADA] creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, [and thus,] Title II validly abrogates state sovereign immunity.")).

"The ADA, RA, and MHRA prohibit a public entity from denying its services to a qualified individual with a disability by reason of that disability." *Hooper v. City of St. Paul*, 17-cv-3442 (PJS/DTS), 2019 WL 4015443, at *5 (D. Minn. Aug. 26, 2019) (citing 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794 (RA); Minn. Stat. § 363A.12, subd. 1 (MHRA)). Courts construe claims under the ADA, the RA and the MHRA similarly. *Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 783–84 (8th Cir. 2012); *Loye v. Cnty. of Dakota*, 625 F.3d 494, 496 & n.2 (8th Cir. 2010). For this reason, courts typically consider these claims together. *Bahl*, 695 F.3d at 783. To establish a prima facie case for disability discrimination, Plaintiff must show that he: (1) is a person with a disability as defined by the statute; (2) is otherwise qualified for the benefit in question; and (3) was excluded from the benefit due to discrimination based on his disability. *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (citations omitted). "The RA contains the additional requirement that the plaintiff show the program or activity from which he is excluded receives federal financial assistance." *Id.* (citations omitted).

Under these statutes, there are two types of discrimination: (1) disparate treatment; and (2) failure to reasonably accommodate the plaintiff's disability. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). In disparate treatment cases, "a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals. The key element is discriminatory intent." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). In reasonable accommodation cases, "the 'discrimination' is framed in terms of the failure

to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Id.* at 767.  Liberally construed, Mr. Larson's Amended Complaint asserts claims under both theories.  (*See, e.g.*, ECF No. 30 ¶¶ 134) (alleging discrimination "on the basis of disability … and by failing to accommodate his disabilities".)

DHS seeks dismissal of these claims on two grounds.  First, it argues Mr. Larson's claims must be dismissed because they focus on his disagreements with his diagnoses and treatment.  (*See* ECF No. 68 at 14–15.)  To the extent that Mr. Larson predicates his disability discrimination claims on allegedly improper treatment decisions, the Court recommends dismissal on the ground that improper treatment is not a cognizable legal theory under the ADA, RA or MHRA.  *See Shelton v. Arkansas Dep't of Hum. Servs.*, 677 F.3d 837, 843 (8th Cir. 2012) (holding that a "claim based upon improper medical treatment decision may not be brought pursuant to either the ADA or the Rehabilitation Act").

 But "insofar as a plaintiff alleges that because of his PTSD he has been placed in solitary confinement and has been excluded from participation in or denied the benefits of certain prison services, programs, and activities, a plausible disability discrimination claim for relief is stated." *Saylor v. Nebraska*, 8:20-cv-264, 2021 WL 2593449, at *2 (D. Neb. June 24, 2021) (cleaned up) (citing *Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634–35 (8th Cir. 2014) (per curiam) (affirming dismissal of ADA and RA claims involving medical treatment decisions, but reversing dismissal of claims based on denial of meals, adequate housing, and physical therapy in solitary confinement)); *see also, e.g.*, *Andrews v. Rauner*, 3:18-cv-1101, 2018 WL 3748401, at *5 (C.D. Ill. Aug. 6, 2018) (placing an inmate in solitary confinement because of her mental disability stated ADA and RA claims); *Corbin v. Indiana*, 3:16-cv-602 (PPS/MGG), 2018 WL 1920711, at *3 (N.D. Ind. Apr. 23, 2018) (claim that plaintiff "was denied basic psychological care and services

while he was housed in solitary confinement and that other inmates were afforded such services" and that the State "refused requests to transfer [him] to a prison unit where he could receive services for his mental disabilities" plausibly alleged violation of the ADA).  Mr. Larson's claim that DHS denied him access to treatment, programming and services by housing him in solitary confinement in response to his mental illness thus asserts a cognizable legal theory under these statutes.

Second, DHS argues MSOP staff placed Mr. Larson in solitary confinement in response to his behavior; not his PTSD.  DHS contends dismissal is appropriate because he has not specified which of his symptoms are linked to PTSD and which of his symptoms are not linked to PTSD, and because the Amended Complaint contains no specific factual allegations establishing that he is in solitary confinement because of his PTSD.  (ECF No. 68 at 15.)  Though DHS ultimately may be able to establish that MSOP placed Mr. Larson in solitary confinement and denied him benefits for reasons that are unrelated to PTSD, *see Estate of Crandall v. Godinez*, 14-cv-1401, 2015 WL 1539017, at *1 (C.D. Ill. Mar. 31, 2015) (dismissing ADA claim based on solitary confinement because plaintiff asserted theft was the reason for such confinement), the Court is unable to make that determination at this stage in the proceedings.  Mr. Larson alleges his symptoms of PTSD— and thus the mental illness itself—are the reason for his confinement and loss of benefits and services.  (*See* ECF No. 30 ¶ 70, stating that PTSD "severely limits" his ability to regulate his emotions, which in turn makes it very difficult for him to control his behavior when agitated or provoked, causing MSOP employees to punish him with solitary confinement; *id.* ¶ 88, alleging MSOP routinely punishes him for exhibiting symptoms of PTSD by forcing him to remain in solitary confinement.)  Mr. Larson identifies a number of specific benefits and services to which— unlike other MSOP detainees—he has not had access as a result of his confinement.  (*See* ECF No.

30 ¶ 92, listing programs and activities he is denied in solitary confinement.)  Mr. Larson also contends MSOP has withheld "approved" medical assessments in response to behaviors arising from PTSD. (ECF No. 30 ¶ 94, alleging MSOP has withheld MRI testing, TBI screening, and neuropsychological and functional assessments.)  *See Corbin*, 2018 WL 1920711, at *3 (plaintiff stated a claim for relief when he alleged that he "was denied basic psychological care and services while he was housed in solitary confinement and that other inmates were afforded such services"). Though Mr. Larson has not established a conclusive link between his alleged PTSD symptoms and the deprivations he identifies, asking him to do so at this early stage in the case—without access to medical expertise or records—sets the bar too high.  The Court therefore recommends Mr. Larson's ADA, RA and MHRA claims be allowed to proceed.

### viii.    Count 7: ADA Retaliation and Coercion

Mr. Larson alleges Defendants discriminated against him for opposing practices made unlawful by the ADA, and further "coerced and interfered with" his exercise of rights under the ADA.  (ECF No. 30 ¶ 149.)  To state an ADA claim for retaliation, a plaintiff must establish that "(1) he engaged in statutorily protected activity; (2) adverse action was taken against him; and (3) a causal connection exists between the adverse action and protected activity." *Rinehart v. Weitzell*, 964 F.3d 684, 689 (8th Cir. 2020) (citing *Steward v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007)).  "Filing an ADA grievance 'is protected activity under the ADA as long as [the plaintiff] had a reasonable good faith belief in the allegations contained the grievance.'" *Id.* at 689 n.6 (quoting *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999)).

The only allegation relevant to this claim is Mr. Larson's assertion that Defendants Gilpin and Boder have retaliated against him in response to his various complaints and grievances against MSOP.  (ECF No. 30 ¶ 71.)   Mr. Larson specifically contends Ms. Gilpin and Ms. Boder denied

his ADA reasonable accommodation request and then omitted important information from his appeal of their decision, thereby justifying its denial.  (ECF No. 30 ¶¶ 72–76.)  The DHS Defendants seek to dismiss this claim on the ground that Mr. Larson fails to plausibly plead a but-for causal connection between his protected activity and any adverse action against him.  (ECF No. 68 at 16.)  The Court recommends granting the DHS Defendants' motion with respect to this claim, but for different reasons.

Mr. Larson satisfies the requirement to allege statutorily protected activity by pleading that he filed an ADA Request for Reasonable Modification.  Mr. Larson appears to contend that the omission of information from his appeal of its denial constitutes adverse action.  To the extent he bases his ADA retaliation claim on that alleged omission, the causation requirement is also met: Defendants Boder and Gilpin could not have removed information from the file on his Request for Reasonable Modification if he had not filed the request in the first place.  This claim fails, however, because the removal of information from Mr. Larson's ADA Request for Reasonable Modification—while relevant to whether the denial of his request was appropriate—does not constitute adverse action as defined for purposes of an ADA *retaliation* claim.

An action is adverse for purposes of the ADA if it is enough "to dissuade a reasonable person from engaging in the protected activity …." *A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013); *see also Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 943 (8th Cir. 2019) (holding in the employment context that an action is adverse if it is serious enough to dissuade a reasonable worker from engaging in protected conduct).  Though the omission of information from the file might have had an impact on whether the appeal of that particular accommodation request was properly granted or denied, it is not the kind of serious action that would dissuade an objective reasonable person from further appealing the decision or bringing

35

future requests for accommodation. And the denial of an ADA reasonable modification request alone does not give rise to a retaliation claim. *See Ehlers v. Univ. of Minnesota,* 18-cv-2794 (PJS/TNL), 2021 WL 663730, at *20 (D. Minn. Feb. 19, 2021) ("The flaw in this argument is obvious: If every denial of a request for reasonable accommodation gave rise to a claim for retaliation, then every denial of a request for reasonable accommodation would give rise to two claims: a claim for failing to reasonably accommodate and a claim for retaliating."), *aff'd*, 34 F.4th 655 (8th Cir. 2022). The Court thus concludes the alleged omission of information from Mr. Larson's Reasonable Modification Request does not establish an actionable ADA retaliation claim.

Further, to the extent Mr. Larson asserts that any other alleged adverse action against him was retaliation for bringing his ADA accommodation request, his Amended Complaint fails to satisfy the pleading requirements of Rule 8(a). It does not provide sufficient notice for any Defendant to reasonably respond or include facts from which the Court could plausibly infer that any Defendant acted against him because he sought accommodations under the ADA. *See Iqbal*, 556 U.S. at 678. The Court recommends dismissing Count 7 of the Amended Complaint for these reasons.

### ix.    Count 8: Denial of Treatment

Mr. Larson seeks relief under Section 1983 on grounds that the Defendants' "deliberate disregard" for his "serious medical needs" constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. (ECF No. 30 ¶ 152.) As previously discussed, Mr. Larson's denial of treatment claim properly arises under the Fourteenth Amendment and not the Eighth Amendment because he is not in custody as punishment for a criminal conviction. *See Housman*, 2016 WL 7231600 at *3.

36

The deliberate indifference standard under the Eighth Amendment applies to Mr. Larson's Fourteenth Amendment claim, however. *Benson v. Jesson*, 22-cv-3059 (JWB/DLM), 2024 WL 1528396, at *11 (D. Minn. Jan. 30, 2024), *report and recommendation adopted as modified*, 2024 WL 1175226 (D. Minn. Mar. 19, 2024). "Deliberate indifference has both an objective and subjective component." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). "The objective component requires a plaintiff to demonstrate an objectively serious medical need." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (citations omitted). "A medical condition is objectively serious if the [detainee] was diagnosed by a doctor or it is so obvious that a lay person would recognize the medical need." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (internal quotation and citation omitted), *as amended* (Mar. 4, 2016). "The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." *Id.* (citations omitted). It "requires a mental state 'akin to criminal recklessness.'" *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (quoting *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014)). "Even medical malpractice does not automatically constitute deliberate indifference." *Saylor*, 812 F.3d at 644 (citing *Jackson*, 756 F.3d at 1060).

The following specific allegations can be construed as relevant to Mr. Larson's claim: (1) Ms. MacDowell's alleged failure to diagnose his PTSD in 2017 and Defendants' subsequent failure to treat it (ECF No. 30 ¶¶ 24–31, 42); (2) the alleged failure of Ms. MacDowell or any staff psychologist or psychiatrist to see him after he smeared feces on himself and ate it (*id.* ¶¶ 40–41); (3) Ms. Peterson's alleged refusal to reassess his psychological conditions upon request (*id.* ¶ 51); (4) Defendants' refusal to place him in a single cell, transfer him to St. Peter, or provide him with EMDR or neurofeedback therapy (*id.* ¶¶ 54); and (5) Defendants' failure to schedule MRI testing, TBI screening, or neuropsychological and functional assessments (*id.* ¶¶ 94-95).

None of these claims describes treatment decisions that rise to the level of criminal recklessness. That Ms. MacDowell did not diagnose Mr. Larson with PTSD in 2017 though he was diagnosed with it five years later does not allege criminal recklessness, particularly since Mr. Larson states his condition worsened over time. (*See* ECF No. 30 ¶ 85.) Mr. Larson complains about Defendants' decisions not to provide him with certain treatments and assessments he believes he should receive, but "an inmate is not entitled to any particular course of treatment." *Hancock v. Arnott*, 39 F.4th 482, 488 (8th Cir. 2022) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir. 1997)). And though Mr. Larson alleges no one directly responded to him smearing feces on himself and eating it, he does not allege he received no mental health treatment at all and Court cannot plausibly infer that a direct response was the only reasonable treatment option.[6] Since Mr. Larson does not claim to have received no treatments or assessments or address what treatments or assessments he actually received, he does not establish a basis from which a plausible inference might be drawn that Defendants have been deliberately indifferent to his medical needs.

### x.    Counts 9-10: Supplemental State Law Claims

Count 9 alleges Defendants negligently failed to comply with Minn. Stats. §§ 235B (the Minnesota Commitment and Treatment Act), 235D (the Minnesota Commitment and Treatment Act: Sexually Dangerous Persons and Sexual Psychopathic Personalities); and 144.651 (the Minnesota Health Care Bill of Rights). (ECF No. 30 ¶ 155–56.) As grounds for these claims, the Amended Complaint alleges Defendants, collectively "failed to provide Mr. Larson with courteous treatment, appropriate health care, freedom from maltreatment, personal privacy, and failed to

---

[6] Any such response necessarily would have called attention to the behavior and thus potentially reinforced it.

uphold Mr. Larson's right to be free from physical restraint and isolation except in emergency situations involving a likelihood of physical harm to himself or others." (ECF No. 30 ¶ 155.) Mr. Larson does not point to any individual Defendant he alleges was negligent, state how they were negligent, or identify any particular provision of these statutes he believes Defendants violated. Count 10 further alleges Defendants committed a litany of state torts, including: malicious prosecution; defamation; misrepresentation; abuse of process; false imprisonment; professional negligence; negligence per se; intentional, reckless, and negligent infliction of emotional distress; assault; battery; and fraud." (*Id.* ¶ 159.) The Court is unable to wade through this kitchen-sink style collection of undifferentiated state tort claims and attempt to coherently attribute specific allegations to particular claims or defendants. These claims run afoul of Rule 8(a) and the Court recommends Counts 9 and 10 be dismissed on that ground.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Mr. Woods' Motion to Dismiss (ECF No. [58]) be **GRANTED** in its entirety; and

2.    The DHS Defendants' Motion to Dismiss (ECF No. [68]) be **GRANTED IN PART AND DENIED IN PART** as follows:

   a.  MSOP should be **DISMISSED**;

   b.  All individual capacity claims against the DHS Defendants should be **DISMISSED**;

   c.  All official capacity claims for damages should be **DISMISSED**;

   d.  The following claims for declaratory and injunctive relief should be allowed to proceed:

      i.   Claim 1 - Unlawful Punishment: official capacity claims only;

      ii.  Claims 4–6 - ADA, RA and MHRA Disability Discrimination: against DHS only; and

e.   All other claims should be **DISMISSED**.

Dated: May 16, 2024                          *s/ Dulce J. Foster*_____
                                             Dulce J. Foster
                                             United States Magistrate Judge

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).